Filed 9/30/13  P. v. Gonzalez CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ALVARO ATLAGCE GONZALEZ,<br><br>     Defendant and Appellant. | H038025<br>(Monterey County<br>Super. Ct. No. SS091909) |

Defendant Alvaro Atlagce Gonzalez was convicted by jury trial of first degree murder (Pen. Code, § 187, subd. (a)),[1] second degree robbery (§ 211), and driving or taking a vehicle (Veh. Code, § 10851, subd. (a)).  The jury also found true a special circumstance allegation that the murder had been committed while defendant was engaged in the commission of robbery (§ 190.2, subd. (a)(17)(A)).  The court imposed a 25 years to life sentence for the murder count, a three-year term for the robbery count, and a concurrent term for the driving or taking a vehicle count.

On appeal, defendant contends that the trial court prejudicially erred in failing to instruct on duress as a defense to robbery as the underlying felony for felony-murder liability for the murder.  He also maintains that section 654 required that the terms for the robbery and driving or taking a vehicle counts be stayed.  We find no error in the court's

_____

[1]     Subsequent statutory references are to the Penal Code unless otherwise specified.

refusal to instruct on duress or in its imposition of a separate sentence for the robbery count.  However, we conclude that section 654 did apply to the driving or taking a vehicle count, and we modify the judgment accordingly.

## I.  The Prosecution's Case

A man's dead body was discovered floating in the water below a bridge over Arroyo Seco on the morning of August 2, 2009.  Blood was found on the bridge.  An autopsy revealed that the man had suffered numerous blunt force injuries to his face.  He had been struck at least 10 times in the head, and there were defensive wounds to his hands.  The cause of death was drowning; his other injuries would not have been imminently fatal.

It took four days for Monterey County Sheriff's detectives to learn that the body was that of Crescencio Garcia.  They contacted Garcia's stepfather who told the detectives about Garcia's car.  Garcia's car was located and searched.  A receipt from a market in Salinas for a six-pack of beer was found in the car.  The receipt was from 11:11 p.m. on August 1, 2009.  The detectives were able to match the time on the receipt to video of the person who had made the beer purchase.  A still photo from the video was shown to people at Garcia's workplace.  The man in the photo was identified as Garcia's coworker Enedino Perea.[2]  The detectives then interviewed Perea and learned of defendant's possible involvement.  Perea is defendant's uncle, his mother's brother.  Perea was arrested.  The detectives then made contact with defendant at his residence and took him into custody.  The insurance card for Garcia's car was found under the pillow on defendant's bed.

---

[2]  The detectives later discovered that Perea had also purchased a case of beer at another market in Salinas earlier that evening.

2

Defendant was interviewed by the detectives on August 11, 2009.[3] He told the detectives that Perea had told him that he had invited Garcia to defendant's home and that Garcia was going to pay for some beer. Perea and Garcia came to defendant's home around 7:00 p.m. on August 1, picked him up in Garcia's car, and went to a store where Perea purchased two 12-packs of beer. They all drank beer in the car for a couple of hours. By midnight, Garcia was too drunk to drive. Garcia got into the back seat, and Perea took over as the driver of the car.

When Perea took over as driver, he told defendant "we are going to . . . take his money and, and his car." Perea said that Garcia had a thousand dollars. With defendant in the front passenger seat, Perea drove the car around for a while, and then he drove to Arroyo Seco. Defendant "fell asleep" for "a while." He woke up shortly before Perea pulled the car over next to a bridge at Arroyo Seco. Garcia was still sleeping in the back seat. Defendant and Perea got out of the car, and Perea "looked" in the trunk of the car "for something to hit him with." Perea pulled a metal rod out of the trunk. Perea told defendant: "We have to hit him." "And then, uh well like that then, it was like he forced me like that then, saying like, 'Well go ahead, go ahead and give him the first hit.'" Perea leaned into the car and hit Garcia in the head with the rod. Garcia got out of the car, and Perea handed the rod to defendant.

Perea told defendant: "Hit him." Perea said: "'I am going to hold him and go ahead and hit him a few times.' Then, well I hit him like this, I hit him, no three (3) small hits." These "hits" were "in the head" and were "as hard as I could" but were "[n]ot very hard" given that defendant was "drunk then." Garcia fell down, and defendant stopped hitting him. Defendant could tell that Garcia was still breathing. Perea began dragging Garcia. Defendant helped Perea "a little bit with the feet," and

---

[3]     A video recording and transcript of this interview were admitted at trial. At the conclusion of this interview, defendant was arrested.

they threw Garcia off the bridge into the water. After they had done so, they returned to the car.

Perea told defendant that he had taken Garcia's wallet. The wallet contained no money, but there were two checks in it. Each of the checks was for $500. The next day, Perea cashed one of the checks, and defendant cashed the other by signing Garcia's name.[4] They abandoned the car after Perea removed its stereo. Perea told defendant not to say anything about what they had done.

## II. The Defense Case

The only defense witness at trial was defendant. He recounted how he had come to Salinas from Mexico in 2008 with his uncle Perea. Perea was seven or eight years older than defendant and had "said that . . . he could take care of me" and "get me a job." After he arrived in Salinas, defendant did not see Perea frequently. Defendant had met Perea's coworker Garcia a few times. Garcia was also older than defendant. On the evening of August 1, 2009, Perea and Garcia came by defendant's residence as defendant was starting to have dinner, around 6:00 or 7:00 p.m. Perea said that Garcia "had invited him out to have some beer." Perea asked defendant if he wanted to accompany them, but defendant "said no, I was having dinner." Perea said he would wait for him outside and did so. When defendant was done with his dinner, he, Perea, and Garcia left in Garcia's car.

They drove around and then went to a store where Perea bought some beer. Defendant could not remember how many beers Perea bought, but it was more than six. They drank beer and drove around. Defendant drank eight beers, which was more than the one or two that he usually drank. At some point, Garcia told Perea that he was too

---

[4] The police obtained video showing that defendant had been with Perea when Perea cashed Garcia's paycheck.

4

drunk to drive, and Perea volunteered to take over driving. Perea moved to the driver's seat. Garcia got into the backseat and fell asleep, and defendant moved to the front passenger seat.

After Perea took over as driver, Perea told defendant that Garcia "had some money," and "we're going to steal the car and the money." Perea told defendant that Garcia "had about a thousand dollars on him." Defendant testified: "I thought he was just playing around." Defendant's testimony was unclear about whether he told Perea that he would help him steal Garcia's money and car.[5] He testified that he was "really drunk" and tired at that point. "I felt dizzy. I could see things, but it was all very blurry, very confusing. I didn't feel the same as one would feel when one is normal." Defendant fell asleep for a while, and when he awoke he saw a sign that said Arroyo Seco. He fell back to sleep and awakened when the car came to a stop.

Perea shook him and told him to "get up." Defendant got out of the car feeling drunk and dizzy. Perea was outside the car with a "metal thing" in his hand. Garcia remained asleep in the back seat. Perea "woke [Garcia] up by hitting him a few times" in the head. Garcia "got up and he was all confused or upset." Garcia was "[v]ery, um, riled up. Violent." Asked to be more specific about Garcia's conduct, defendant testified that Garcia was "trying to get up and looking around to see who hit him, to see what happened." Perea "held on to" Garcia. Perea "yell[ed]" at defendant "to hit him, that I had to beat him." "[H]e kept on insisting. And then he said if I didn't do it, that he, [Garcia], would hit me or that he would kill me." Perea, who was about six feet away

---

[5]  This colloquy occurred during direct examination: "Q Did you tell him you would help take the car and the money? [¶] A Yes. He just told me he has money, we're going to take the car. And but he didn't tell me at that time to help him. [¶] Q And you didn't say to him -- did you say to him, 'I'll help you do that,' at that time? [¶] A No." Defendant was testifying through an interpreter.

5

from defendant when he made these statements, "gave me the metal thing. He said, 'Take it. Hit him.'" Garcia said nothing.

Defendant testified: "[T]he way that [Perea] was acting, and so was [Garcia], I was afraid of something happening to me. I was confused." He was afraid that Perea might "[p]erhaps beat me or something like that." However, defendant testified that Perea was *not* "being threatening and violent" but "was only acting differently from what I know him." Defendant was also concerned that Garcia "might harm [him] in some way." Defendant was afraid that Perea "might let [Garcia] go and that he would come at me." Perea continued to hold Garcia. "I ended up hitting him when my uncle told me to." Defendant hit Garcia four or five times in the head, and Garcia lost consciousness and fell to the ground. Perea then dragged Garcia to the edge of the bridge. Defendant could hear that Garcia was still breathing. Defendant was "very afraid," and he followed Perea. Defendant grabbed Garcia's feet, and they threw Garcia off the bridge.

As soon as they got back in the car, defendant asked Perea if he had gotten the money. The next day, Perea showed him the checks, and "he wanted for me to cash one and he was going to cash another one." They "went to the store to cash them." Perea cashed both of the checks. Perea told defendant "not to say anything, that nothing happened."

### III. Procedural Background

The defense asserted in its trial brief that it would present evidence that "any participation by [defendant] in the robbery which resulted in death was due to duress or threats of his older uncle." The prosecution's trial brief "conceded that duress could be a defense to felony murder if substantial evidence of duress is shown. And if so, Defendant would be entitled to such a jury instruction."

At the instruction conference after the close of evidence, the defense requested duress instructions (CALCRIM No. 3402). Defendant's trial counsel argued to the court

6

that defendant's testimony reflected that there had been "an implied threat [from] his uncle, not the other man . . . I'm arguing the threat was from the uncle. And that was based on his conduct." The court rejected the request. "From a review of the evidence there does not appear to be any implied or explicit threat. There is no showing that there was an immediate threat. In fact, . . . the uncle is holding onto the victim while asking the defendant to strike the victim." "There is no evidence, much less substantial evidence, of immediate danger. . . . I don't see how any rational, reasonable jury could conclude that the defendant's belief was reasonable." The jury was instructed on both premeditated murder and felony murder.

The jury returned guilty verdicts on all three counts and found the special circumstance allegation true. The court exercised its discretion under section 190.5, subdivision (b), due to the fact that defendant was 17 years old at the time of the murder, and committed defendant to state prison to serve a term of 25 years to life for the murder count. The prosecution recommended that the court impose "five years on the robbery; and that the auto theft be ruled 654, stayed sentencing on that, pursuant to 654." The court imposed a three-year term for the robbery count. It rejected the prosecution's assertion that section 654 applied to the driving or taking a vehicle count and imposed an unstayed concurrent two-year term for that count. "As to Count 3, the 10851, the Court does not find 654 is applicable here as to a 10851 as separate elements, and the robbery was not just for the car, but other items." Defendant timely filed a notice of appeal from the judgment.

## IV. Discussion
### A. Court's Refusal To Give Duress Instructions

Duress is a defense to a crime not punishable by death where the person "committed the act or made the omission charged under threats or menaces sufficient to

show that they had reasonable cause to and did believe their lives would be endangered if they refused." (§ 26.)

"Defendant needs to raise only a reasonable doubt that he acted in the exercise of his free will. [Citation.] In order to show that his act was not the exercise of his free will, defendant must show that he acted under an immediate threat or menace. [Citation.] 'Because of the immediacy requirement, a person committing a crime under duress has only the choice of imminent death or executing the requested crime. The person being threatened has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent. The unlawful acts of the person under duress are attributed to the coercing party who supplies the requisite mens rea and is liable for the crime. [Citation.]' [Citation.] Decisions upholding the duress defense have uniformly involved '"a present and active aggressor threatening immediate danger."'" (*People v. Petznick* (2003) 114 Cal.App.4th 663, 676 (*Petznick*).)

Although duress is not a defense to murder, "duress can, in effect, provide a defense to murder on a felony-murder theory by negating the underlying felony. [Citations.] If one is not guilty of the underlying felony due to duress, one cannot be guilty of felony murder based on that felony." (*People v. Anderson* (2002) 28 Cal.4th 767, 784.) "Although a number of cases in this state have held that the fear must literally be of death, . . . the fine distinction between fear of danger to life and fear of great bodily harm is unrealistic. . . . [H]owever, the threat must be of present, immediate harm, not future violence." (*People v. Perez* (1973) 9 Cal.3d 651, 657-658, citations omitted.)

"A trial court is required to instruct sua sponte on a duress defense if there is substantial evidence of the defense and if it is not inconsistent with the defendant's theory of the case." (*People v. Wilson* (2005) 36 Cal.4th 309, 331 (*Wilson*).) "'Substantial evidence is "evidence sufficient 'to deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.'"'" (*Wilson*, at p. 331.)

The issue here is whether there was substantial evidence that Perea made "threats or menaces" that were sufficient to create "reasonable cause" for defendant to believe that his life would be immediately endangered if he did not participate in the robbery of Garcia. The trial court correctly concluded that there was not.

Defendant did not describe anything approaching a threat or menace by Perea. When Perea first mentioned the plan to rob Garcia, Perea simply said that "we" were going to steal Garcia's money and car. After Perea stopped the car at the bridge, Perea told defendant: "We have to hit him." Although defendant claimed in his statement that "it was like he forced me," the only thing he mentioned Perea doing was hitting Garcia and telling defendant that he would hold Garcia and defendant should "'go ahead and hit him a few times.'" No evidence of threat or menace by Perea was mentioned.

Defendant's trial testimony, while more detailed, also failed to mention any threat or menace by Perea. Defendant testified that, after Perea hit Garcia, Garcia got up and seemed "upset," "riled up," and "[v]iolent," though Garcia said nothing Perea told defendant that "he, [Garcia], would hit me or that he would kill me" if defendant did not hit Garcia. Because Perea was holding Garcia at that time, Garcia posed no immediate threat to defendant. However, defendant testified that he was afraid that Perea "might let [Garcia] go and that he would come at me" and "might harm [him] in some way."

Any menace that defendant may have perceived that Garcia posed to him was irrelevant to a duress defense because Garcia was not the "'coercing party'" who was attempting to obtain defendant's participation in the robbery. (*Petznick*, *supra*, 114 Cal.App.4th at pp. 675-676.) Only threats or menace *by Perea* could possibly supply the requisite evidence to support a duress defense. Defendant claims that Perea made an "implied threat to release the angry Garcia." Yet defendant's testimony did not disclose that Perea made even an implied threat to do so. Defendant testified that Perea said that Garcia would hit or kill defendant if defendant did not hit Garcia, but his testimony provided no reasonable basis for a belief that Perea would *release* Garcia if defendant did

9

not hit Garcia. Defendant knew that Perea's goal was to steal Garcia's money and car. Releasing Garcia before he had accomplished this goal would hinder this plan. As there was no evidence that Perea had any animosity toward defendant, there was no reasonable basis for defendant's speculative fear that Perea would purposely free Garcia so that Garcia could harm defendant.

Defendant's only testimony about *Perea's* statements and conduct did not disclose any threats or menace by Perea. Defendant testified that Perea "yell[ed]" at him "to hit [Garcia], that I had to beat him." "[H]e kept on insisting." Defendant testified: "[T]he way that [Perea] was acting, and so was [Garcia], I was afraid of something happening to me. I was confused." He was afraid that Perea might "[p]erhaps beat me or something like that." However, defendant testified that Perea was *not* "being threatening and violent" but "was only acting differently from what I know him."

Thus, at most, defendant's testimony disclosed that he was "afraid of something happening to me" and feared that Perea might "beat me or something like that" even though Perea was not "being threatening or violent" and had done nothing more than "yell[ed]" and "insist[ed]" that defendant participate. Defendant's subjective fears alone were inadequate to support duress instructions. Duress is a defense only where fears arise from "threats or menace" and are "sufficient" to provide "reasonable cause" to believe one's life is in danger. Here, Perea made no threats and exhibited no menace. Hence, there was no "reasonable" basis for defendant's fears. Such evidence falls far short of raising a reasonable doubt that defendant's participation was coerced by "threats or menaces sufficient to" provide "reasonable cause" for believing that his life would be endangered if he did not comply. The trial court did not err in refusing to give duress instructions.

10

## B. Section 654

"The initial inquiry in any section 654 application is to ascertain the defendant's objective and intent. If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.) " 'The defendant's intent and objective are factual questions for the trial court; . . . there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced.' " (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

### 1. Sentences For Both Murder and Robbery

Defendant contends that the trial court should have stayed the term it imposed for the robbery count because the robbery and the murder were parts of an indivisible transaction. He claims that the jury's special circumstance finding necessarily established that the jury relied on a felony-murder theory and, in his view, "Section 654 bars separate punishment for a felony when it is the basis for a first degree murder conviction."

The jury's true finding on the special circumstance allegation did *not* necessarily establish that the jury proceeded on a felony-murder theory in finding defendant guilty of murder. The jury could have concluded that a premeditated killing occurred in the commission of the robbery. The evidence supported a finding that, after Garcia had been knocked unconscious to permit the taking of his wallet and car, thus accomplishing the robbery, Perea and defendant made a willful, deliberate, and premeditated decision to throw him off of the bridge knowing that he would drown in the water below. The fact

11

that the killing was an afterthought to the robbery did not preclude a finding that the special circumstance was true. "[T]he killing 'need not occur in the midst of the commission of the felony, so long as that felony is not merely incidental to, or an afterthought to, the killing.'" (*People v. Elliot* (2005) 37 Cal.4th 453, 475.) Here, the opposite was true. The killing was an afterthought to the robbery. Therefore, the special circumstance finding did not preclude a conclusion that section 654 did not apply,

Substantial evidence supports the trial court's implied finding that the murder had an objective separate from the robbery. The robbery was committed to obtain Garcia's money and car. Before the murder, Garcia had already been knocked unconscious, and Perea had taken unchallenged possession of Garcia's wallet and car. The only possible reason for throwing Garcia off the bridge was to dispose of the sole witness to the robbery in hopes of avoiding identification as the robbers. While these objectives are not unrelated, the trial court could have concluded that they were sufficiently distinct to warrant separate punishment.

### 2. Sentences For Both Robbery and Driving or Taking a Vehicle

Defendant argues, and the Attorney General concedes, that substantial evidence does not support the trial court's express finding that section 654 did not preclude separate sentences for the robbery count and the driving or taking a vehicle count. We agree. "[T]he taking of several items during the course of a robbery may not be used to furnish the basis for separate sentences." (*People v. Bauer* (1969) 1 Cal.3d 368, 376-377.) Perea's plan from the start was to take both Garcia's money and his car. As the taking of the car was one of the two objectives of the robbery, section 654 applies.

### V. Disposition

The judgment is modified to reflect that the concurrent term imposed for the driving or taking a vehicle count is stayed under section 654. The trial court is directed to prepare an amended abstract of judgment reflecting this modification and to forward a

12

certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  The modified judgment is affirmed.


_____

Mihara, J.


WE CONCUR:


_____

Premo, Acting P. J.


_____

Grover, J.