Filed 2/24/16  P. v. Petroski CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C073879 |
| Plaintiff and Respondent, | (Super. Ct. No. P11CRF0630) |
| v. | |
| RICHARD KENNETH PETROSKI, | |
| Defendant and Appellant. | |

Defendant Richard Kenneth Petroski was charged with murder and convicted of the lesser included offense of voluntary manslaughter after he shot and killed his stepfather, John Malia.  (Pen. Code, §§ 187, subd. (a), 192, subd. (a); unless otherwise set forth, section references that follow are to the Penal Code.)  The jury also found true the special allegation that defendant personally used a firearm during the offense. (§ 12022.5, subd. (a).)  He was sentenced to 21 years in state prison.

1

Defendant raises several contentions on appeal, including (1) that the trial court abused its discretion and denied him the right to present a complete defense by excluding evidence that Malia had shown defendant inappropriate computer images of young girls, (2) his counsel was ineffective for failing to request a jury instruction on accidental homicide, (3) the court had a sua sponte duty to instruct on involuntary manslaughter, (4) the errors, both individually and cumulatively, rendered his trial fundamentally unfair, and (5) that the court erred in sentencing him to the upper term for both voluntary manslaughter and the firearm use enhancement.

We conclude the trial court erred in failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter. On this record, we cannot say the error did not prejudice defendant. Although we find sufficient evidence supports defendant's voluntary manslaughter conviction we nevertheless reverse. Given our reversal, we need not reach defendant's other contentions on appeal.

FACTS AND PROCEEDINGS

A.    Malia Killing

In the early morning hours of December 4, 2011, defendant awoke Amy Settle and told her he had shot and killed Malia. Settle lived in a trailer next to Malia's house on his rural property in Placerville. Defendant also lived on the property in a separate trailer.

Although at first she thought defendant was kidding, Settle eventually ran from her trailer to Malia's house. The front door was open and Malia was lying inside the doorway injured. He had been shot in the head with a .22 caliber rifle.

Defendant, who was still carrying the rifle, handed the gun to Settle and asked her to shoot him. She took the gun from him intending to throw it off the porch, but defendant grabbed it back from her. Settle ran into the house to call 911. She heard a gunshot, and turned around to see defendant lying on the porch. Although defendant had

2

tried to kill himself, the shot merely wounded his forehead and did not completely penetrate his skull.

While speaking with the 911 operator, Settle saw defendant stand up and walk into the living room carrying the gun. He had blood on his forehead. Settle ran out the back door of the house and locked herself in her trailer until police arrived. Defendant, meanwhile, laid the rifle near the front door of Malia's house and walked out.

Although Malia was still alive when police arrived, he later died at the hospital. Police eventually apprehended defendant in a clearing near the house, and he was transported to the same hospital for treatment.

After being advised of his *Miranda* rights at the hospital, defendant admitted he shot Malia. He said Malia was "nothing to [him] anymore," and that Malia "made [him] do it" "[b]ecause he was pushing [defendant's] buttons." He also claimed that he shot Malia because Malia "made [him] get rid of the cats." He told the detective he had aimed or pointed the rifle at Malia so he could see the gun and then fired, shooting Malia above his right eyebrow. Before defendant shot, Malia said, "[W]hat the fuck are you doing?"

Defendant never told the detective that Malia attacked him from behind, that he and Malia wrestled over the rifle, that he grabbed the rifle away from Malia, or that Malia was reaching for a handgun at the time of the incident. Neither did defendant ever claim that the gun accidentally went off. Responding to a question about whether he feared for his own life and defended himself, however, defendant nodded his head "yes."

During a second police interview three days later, defendant told a detective that he had prior experience with firearms and that when he picked up the rifle at Malia's house he could tell the round was not seated properly in the chamber so he physically racked the gun to eject the improperly seated round and to load a live round into the firing chamber. He also said the incident had nothing to do with cats. When asked whether the only two people he meant to hurt that day were Malia and himself, defendant responded, "No, just John [Malia]." He said Malia was always nicer to strangers than to

3

him.  During the interview, defendant often failed to answer questions and sometimes laughed and offered unintelligible responses.

B.     Trial Proceedings

A November 2012 information charged defendant with one count of first degree murder.  (§ 187, subd. (a).)  The information included special allegations that defendant used and personally and intentionally discharged a firearm causing great bodily injury or death.  (§ 12022.53, subds. (b)-(d).)  It further alleged that defendant had also personally used a firearm during the offense under section 12022.5, subdivision (a).

Defendant testified on his own behalf.  His testimony differed somewhat from his previous recorded statements to police, which were played for the jury.  He said he got up early that morning to complete his chores.  He saw Malia sitting in his house through the living room window.  Malia appeared to be watching television, and he waved for defendant to come to the house.  Defendant testified that Malia was leaving on a trip to Thailand for several months and that he wanted defendant to maintain the property and take care of the animals while he was gone.

After knocking on the front door, defendant entered and took off his shoes in the entryway.  He sat down in his "assigned seat" on a small couch near the door, and the two men watched television for about 35 minutes.  Defendant was not allowed anywhere else in the house.  They discussed what defendant needed to do while Malia was in Thailand.

According to defendant, Malia had forgotten that he told defendant he would show him how to hoof the goats that morning and had instead made other plans.  Defendant complained that had he known Malia would be unable to show him how to hoof the goats that morning and he could have gotten work at another job site.  Malia told defendant he had an attitude.

4

The two men stood up, and defendant began putting on his shoes near the front door. He asked Malia what was more important, and Malia purportedly responded that he had things to do on the computer. Defendant then called Malia a pedophile.

Defendant claimed Malia forcefully shoved him in the back and pinned him up against the front door with his arms wrapped around defendant from behind so defendant could not move. Defendant tried to loosen Malia's grip to get free. As the men struggled, defendant noticed his left arm was no longer restricted and he saw that Malia had let go of his arm and had grabbed a rifle. Defendant, who is left-handed, grabbed the rifle with his left hand, trying to wrestle it from Malia. Defendant attempted to shove back from the front door to throw Malia off balance. Defendant fell to the ground and his body landed on the rifle. He saw Malia moving towards the entertainment center where defendant knew he kept a loaded gun. Defendant quickly picked up the rifle with his right hand and the gun went off. Malia stopped moving and defendant ran out of the house still carrying the rifle. Defendant then heard a loud crash.

Defendant said he ran to Settle's trailer and tried to wake her up. He told her he shot Malia and handed her the rifle. When Settle went to Malia's house and saw that Malia was injured she began yelling at defendant. Defendant did not want to be yelled at or lectured and he could not take her yelling anymore. He grabbed the gun back from Settle, put the butt of the rifle on the porch, put his forehead on the barrel, and pulled the trigger. The force from the gunshot whipped his head back and he fell backwards and blacked out. A short time later he regained consciousness. Stunned that he had not died from the gunshot, defendant racked the rifle a few times on the porch to determine the type of ammunition in the gun because he suspected the gun was loaded with bird shot.

Defendant returned to the house, and told Malia to hang on because help was on the way. Defendant could not stand to listen to Malia gurgling on the floor, so he put the rifle down and walked outside. He waited for police near the house.

5

Defendant testified he did not remember speaking to the first detective at the hospital the day of the shooting and only vaguely remembered speaking to the second detective a few days after the incident. He said he was scared for his life and that he did not intend to shoot Malia but that the gun just went off when he picked it up during the struggle. During cross examination, defendant admitted he never told either the police or his family that Malia had attacked him or that the gun had accidentally fired. During closing arguments, defense counsel asserted that defendant had shot Malia in self defense, or, at a minimum, that there had been a sudden quarrel between the men, but he did not argue the shooting was accidental. The prosecutor, however, characterized defendant's testimony as follows: "He is saying [the gun] accidentally went off and magically hit the victim in almost the middle of the forehead." The prosecutor argued defendant had intentionally shot Malia and that the evidence showed it was not a case of self defense or accident.

The court instructed the jury on homicide generally and informed the jury that murder and manslaughter were types of homicides. The court instructed the jury on first degree murder and on second degree murder and voluntary manslaughter as lesser included offenses. It also instructed the jury on self defense, provocation, sudden quarrel or heat of passion, and imperfect self defense. The court asked whether counsel wanted instructions on accident or involuntary manslaughter. Neither counsel, however, requested such instructions and the court did not give them.

The jury found defendant not guilty of first and second degree murder. Because it found him not guilty of murder, the jury did not consider the special allegations under section 12022.53, subdivisions (b) through (d) of whether defendant personally and intentionally discharged a firearm causing great bodily injury or death. The jury convicted defendant of the lesser included offense of voluntary manslaughter and found that he personally used a firearm within the meaning of former section 12022.5, subdivision (a).

6

The court sentenced defendant to 21 years in state prison, consisting of the upper term of 11 years for voluntary manslaughter and the upper term of 10 years for the gun enhancement.  Defendant timely appealed.

DISCUSSION

I

*Duty to Instruct on Involuntary Manslaughter*

Defendant was charged with a single count of murder.  (§ 187, subd. (a).)  Both voluntary and involuntary manslaughter are lesser included offenses of murder.  (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)  While the court instructed the jury on first and second degree murder and on two theories of voluntary manslaughter--that the killing occurred upon a sudden quarrel or heat of passion on sufficient provocation (§ 192, subd. (a)), or that defendant killed in the unreasonable, but good faith, belief that deadly force was necessary to defend himself (*People v. Cruz* (2008) 44 Cal.4th 636, 664)--it did not instruct the jury on involuntary manslaughter.  Defendant contends the court had a sua sponte duty to instruct on involuntary manslaughter.  (§ 192, subd. (b).)  We agree.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

This instructional requirement includes the duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater.  (*Breverman, supra,* 19 Cal.4th at p. 157.)  The duty exists even when the lesser included offense is inconsistent with the defendant's own theory of the case and the

7

defendant objects to the instruction. (*Id.* at pp. 154, 157.) This rule "seeks the most accurate possible judgment by 'ensur[ing] that the jury will consider the *full range of possible verdicts*' included in the charge, regardless of the parties' wishes or tactics." (*Id.* at p. 155.) "Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense." (*Ibid.*)

In deciding whether there is substantial evidence to support a lesser included offense instruction, a court determines only the bare legal sufficiency of the evidence, not its weight. (*Breverman, supra,* 19 Cal.4th at p. 177.) In doing so, courts "should not evaluate the credibility of witnesses," which is a task for the jury. (*Id.* at p. 162.) We review the trial court's failure to instruct on a lesser included offense de novo, considering the evidence in the light most favorable to the defendant. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

According to defendant, the evidence at trial warranted an instruction on involuntary manslaughter on the theory that the killing occurred during the brandishing of a firearm in violation of section 417, subdivision (a)(2), a misdemeanor. Section 417 provides in relevant part, "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel . . . is [guilty of ] [¶] . . . a misdemeanor . . . ." (§ 417, subd. (a)(2).)

Defendant contends the jury could have believed that in grabbing the rifle during the struggle with Malia, he committed a misdemeanor that was inherently dangerous to human life, or that he was criminally negligent in lawfully defending himself against Malia's attack. He asserts the court should have instructed the jury with CALCRIM No. 580, which partly provides: "The defendant committed involuntary manslaughter if: [¶] 1. The defendant committed (a crime/ [or] a lawful act in an unlawful manner); [¶] 2. The defendant committed the (crime/ [or] act) with criminal negligence; [¶] AND [¶] 3. The

8

defendant's acts caused the death of another person." (Judicial Council of California Criminal Jury Instructions (2013), CALCRIM No. 580.)

Although the trial court specifically asked counsel whether they wanted an involuntary manslaughter instruction, it failed to instruct the jury on the lesser included offense after the prosecutor objected on relevancy grounds and defense counsel said he could not conjure a theory to support the instruction. Regardless of whether either counsel requested or objected to an involuntary manslaughter instruction, however, we believe the evidence was sufficient to warrant the court giving such an instruction sua sponte.

Defendant testified he grabbed the gun with his non-dominant hand after struggling with Malia and that it accidentally fired. He said he picked it up quickly and believed Malia was trying to retrieve a loaded gun in the nearby entertainment center. Besides Malia, who was killed, no one else witnessed the circumstances of the shooting.

It is well established that the testimony of a single witness, including a defendant, can constitute substantial evidence to warrant giving particular instructions. (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) Although defendant's testimony appears to conflict with what he told officers after the shooting, any doubts about the sufficiency of the evidence to warrant an instruction should have been resolved in defendant's favor. (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677.) Because we are bound to determine only the bare legal sufficiency of the evidence presented and may not judge witness credibility on appeal (*Breverman, supra,* 19 Cal.4th at pp. 162, 177), we find defendant's own testimony was sufficient to warrant an involuntary manslaughter instruction based on a misdemeanor brandishing theory.

A reasonable jury could believe that defendant committed the misdemeanor offense of "brandishing" a firearm when he grabbed the rifle during the struggle with Malia. (*People v. Lee* (1999) 20 Cal.4th 47, 61 [court erred in failing to instruct sua sponte on misdemeanor manslaughter theory of involuntary manslaughter where

9

defendant used his gun in quarrel with his wife, who was subsequently shot and killed].) Because defendant had earlier told police that he was familiar with guns and later testified that he believed all the guns in the house were loaded, although he did not think a live round was in the firing position when he grabbed the rifle, a reasonable jury could also find that defendant was criminally negligent in brandishing the weapon that killed Malia. By failing to give an involuntary manslaughter instruction sua sponte, the court erred.

## II

### *The Instructional Omission was Prejudicial*

Having concluded that the jury should have been instructed on involuntary manslaughter as a lesser included offense to murder, we next consider whether the error was prejudicial. On this record, we find that it was. Although we believe sufficient evidence supports his voluntary manslaughter conviction, we nevertheless reverse. (See *Hussain* (2014) 231 Cal.App.4th 261, 264 [judgment reversed for ineffective assistance of counsel even though sufficient evidence supported defendant's conviction].)

"[T]he failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility." (*Breverman, supra,* 19 Cal.4th at p. 165.) A conviction of the charged offense may be reversed as a result of such an error only if, " 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*Id.* at p. 177; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

"Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Breverman, supra,* 19 Cal.4th at p. 177.) "In making that evaluation, an appellate court

10

may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Ibid.*)

Here, we cannot say after reviewing the record that the evidence that defendant intentionally killed defendant was comparatively stronger than the evidence that he shot Malia without due caution while trying to defend himself, or even accidentally, during a struggle. Although defendant told police the day of the shooting that Malia "made [him] do it" "[b]ecause he was pushing [defendant's] buttons," and that he shot Malia because Malia "made [him] get rid of the cats," at trial defendant testified that the shooting had nothing to do with cats and that he meant Malia was pushing him during the struggle when he said Malia was pushing his buttons. He also explained that he was not thinking properly after he shot himself in the head and that he did not remember his conversations with the detectives. A reasonable jury could have discounted defendant's statements the day of the shooting as a result of the self-inflicted gunshot wound to the head.

While it is true defendant admitted that he never told police or his family that Malia had attacked him or that the shooting was accidental before trial, the jury similarly could have concluded that defendant's ability to completely recount the events leading up to the shooting were impaired from his head wound.

Defendant was acquitted of first and second degree murder. The jury, then, who saw defendant testify and thus assessed his credibility, did not reject defendant's testimony entirely. (*Hussain, supra,* 231 Cal.App.4th at pp. 271-272.) While defendant was convicted of voluntary manslaughter, once the jury acquitted him of murder, its only option was voluntary manslaughter or to let defendant go free. But given the balance of the evidence presented during trial, and since the jury must have accepted at least some of defendant's testimony as true, we cannot confidently say that defendant was unlikely to

11

have received a more favorable outcome had the jury been properly instructed on the misdemeanor manslaughter theory of involuntary manslaughter.

We are not persuaded, moreover, by the People's harmless error argument. According to the People, the jury determined defendant intentionally shot Malia when it found true the special allegation under section 12022.53, subdivision (d) that he personally and intentionally discharged the firearm that killed Malia. The factual question posed by the omitted instruction was thus allegedly "resolved adversely to the defendant under other, properly given instructions." (*People v. Wright* (2006) 40 Cal.4th 81, 98 [" 'In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury' "].)

As defendant points out in his reply, however, the jury never found the personal and intentional discharge enhancement true because it found defendant not guilty of first and second degree murder. Because that enhancement only attached to the murder offenses, there was no need for the jury to consider the enhancement's truth.

The only enhancement the jury found true was the personal firearm use enhancement alleged under section 12022.5, subdivision (a), which was attached to the voluntary manslaughter offense. The jury was instructed that in order to find that defendant "personally used a firearm during the commission of [the] crime" it had to conclude beyond a reasonable doubt that "he intentionally [did] any of the follow[ing]: One, display[ed] the weapon in a menacing manner; Two, hit[] someone with the weapon; or Three, fire[d] the weapon."

While there was no evidence that defendant hit Malia with the rifle, there was evidence that defendant held the gun in a menacing manner and that the rifle was fired. During his statement to police, defendant said he pointed the gun in Malia's direction so Malia could see the weapon. Upon doing so, Malia asked defendant "what the fuck are

12

you doing?" And, because Malia was killed by a single shot to the head, there was evidence that the rifle was fired.

Based on the above evidence, the jury reasonably could have found the personal use enhancement true based either on brandishing the weapon in a menacing manner or by firing the rifle during the alleged struggle. The record, however, does not reveal which option the jury decided upon. Under the circumstances, we believe the error was prejudicial and requires reversal.

### DISPOSITION

The judgment is reversed and the matter remanded to the trial court for retrial in a manner consistent with this opinion.


                                                      HULL               , J.


We concur:


     BLEASE         , Acting P. J.


     DUARTE        , J.