Filed 6/1/26  P. v. Vick CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

| | |
|---|---|
| THE PEOPLE, | C101976 |
| Plaintiff and Respondent, | |
| | (Super. Ct. No. 22F00796) |
| v. | |
| LARRY MICHAEL VICK, | |
| Defendant and Appellant. | |

Defendant Larry Michael Vick sent sexually explicit messages and drawings to an undercover detective posing online as an exploited minor.  He was convicted of distributing harmful matter to a minor and contacting a minor with the intent to commit a sexual offense (Pen. Code, §§ 288.2, subd. (a), 288.3, subd. (a))[1], and sentenced to two years four months in state prison.

Defendant appeals, arguing the trial court erred in failing to stay the sentence for contacting a minor with the intent to commit a sexual offense and denying his motion for a new trial.  Defendant also challenges the sufficiency of the evidence supporting the

_____

[1] Undesignated statutory references are to the Penal Code.

1

conviction for distributing harmful matter to a minor. Finding no error, we will affirm the judgment.

## I. BACKGROUND

*A. The Sting Operation*

In 2021, Shasta County Sheriff's Sergeant Jacob Duncan, then a detective with the Anderson Police Department, was a member of the Internet Crimes Against Children Task Force, which focuses on crimes involving the sexual exploitation of children. Duncan's responsibilities included developing online sting operations using undercover Facebook profiles to target people who might have a sexual interest in children. Defendant, then 44, was one such person.

Sergeant Duncan sent defendant a Facebook friend request in early June 2021, using the name "Kenzie Lee."[2] Defendant accepted the friend request and responded with a waving emoji. Several weeks passed.

Kenzie reinitiated contact with defendant in late June 2021 with a direct message saying, "Hey cutie." Defendant responded along the same lines. After some initial pleasantries, Kenzie revealed she was estranged from her parents, and "couch surfing with friends."[3] She also intimated that she earned money through prostitution.

Kenzie's fictitious Facebook profile indicated she was an adult. However, she soon gave defendant reason to question that status. When asked her age, Kenzie cryptically replied, "im older than i am if that makes sense." Soon thereafter, Kenzie revealed that she was 16 years old. Defendant replied that in that case they should "definitely stay on friend status." All the same, defendant said he would "LOVE" to be

---

[2] For convenience, we will refer to subsequent communications from Duncan posing as Kenzie as being from Kenzie.

[3] Kenzie also revealed that her parents were "assholes from [S]acramento" and "druggies."

2

friends.  Kenzie replied, "hahah … if you want.  i mean i work so im not a stranger to older men lol [¶] gotta make money somehow lol."

Communications continued over the course of the day and into the evening.[4] Defendant invited Kenzie to dinner; she demurred.  They exchanged photographs, or so it seemed, with Kenzie sending a photograph of an adult female decoy with an ambiguous appearance as to age.  Defendant shared photographs of his dune buggies, which led to innuendo about stick shifts.  From there, the conversation became more suggestive, with Kenzie saying she tastes like vanilla and defendant proclaiming his "big appetite." Moments later, Kenzie said, "mmmmmm you want to eat my little pussy all night." Defendant replied, "Hell yes I do."

Shortly thereafter, defendant sent Kenzie the first of three sexually explicit drawings.  The first and second drawings depicted men performing oral sex on women. The third depicted cartoon characters Popeye and Olive Oyl engaged in sexual intercourse.  Defendant and Kenzie discussed their preferred sexual practices and positions, and the importance of keeping any relationship between them a secret.  They also discussed the possibility of meeting, including the possibility that Kenzie might join defendant on an upcoming family trip to the coast.

Defendant allowed for the possibility that the relationship might not become sexual, writing:  "Even if we don't get romantically involved, I'm still game to be in your life k..  I'm pretty excited to take you on this trip."  Kenzie responded, "Okay, handsome. I definitely like what I see."  She added, "im not going to lie im really horny."  Defendant replied, "I can definitely help you with that."  The conversation alternated between sexual matters and mutual excitement about the upcoming trip.  It also included more tender sentiments, such as defendant asking Kenzie whether she liked to cuddle, and Kenzie

---

[4] At some point, they moved from Facebook to text message.

telling defendant he was "already special" to her. The long day of texting started to wind down around 9:00 p.m. Defendant and Kenzie agreed to meet the next day, and Kenzie announced she was tired and ready for bed. Defendant said, "My sweet luv, get some sleep."

Communications resumed around 7:30 a.m. the next morning. Kenzie reopened the dialogue with "Good mornin[g] handsome." Defendant said he missed Kenzie, and had been thinking about her most of the night. He asked if she was ready for their trip. Kenzie replied that she had shared a hotel room with a friend the night before, but the friend would be leaving soon, and she would have the room to herself. She suggested that defendant come to the hotel with breakfast and condoms. Defendant responded, "I know this is going to sound dumb, but I'm a little nervous. Can we go for a walk at the Anderson River Park if lunch there? I would like to walk and talk with you a little and get comfortable." Kenzie replied, "of course daddy. I want u to feel comfortable." Moments later, she added, "im really horny tho… Are u still going to fuck me afterwards?" Defendant responded, "Anything for you baby girl." "But seriously," he said, "I wanna know you for real."

Defendant discussed the possibility that he and Kenzie might have a real connection, saying: "Honestly it scares me to think about it. But I want a great connection. I have a big heart. I wanna share my adventures with someone." Defendant and Kenzie assured one another that they were "real" and promised to treat each other right. They admitted they were nervous about meeting and agreed to rendezvous at a gas station near Kenzie's hotel.

Sergeant Duncan parked near the gas station and watched as defendant arrived in a white truck. An undercover agent confirmed defendant's identity, and other police officers soon arrived and arrested him. Condoms and erectile dysfunction medication were found in defendant's truck. Defendant admitted he had been communicating with Kenzie, and agreed the communications were inappropriate.

4

*B.*     *Trial Court Proceedings*

Defendant was charged by information with sending harmful matter to a minor (§ 288.2, subd. (a)—count 1), contacting a minor for the purpose of committing a sex offense (§ 288.3, subd. (a)—count 2), going to a prearranged meeting with a minor for a lewd or lascivious purpose (§ 288.4, subd. (b)—count 3), and arranging a meeting with a minor for a lewd and lascivious purpose (§ 288.4, subd. (a)(1)—count 4). The information also alleged various circumstances in aggravation. (Cal. Rules of Court, rule 4.421(a)(3) and (b)(2).) Defendant pled not guilty to the charges and denied the aggravating circumstances.

The matter was tried to a jury in May 2024. Prior to trial, the prosecution moved in limine to exclude argument on any entrapment defense. Defendant opposed the motion, arguing Sergeant Duncan's conduct constituted substantial evidence of entrapment. The trial court expressed an inclination to grant the prosecution's motion, but chose to defer ruling on any entrapment instruction until after the close of evidence in the prosecution's case in chief. In the meantime, defense counsel was barred from using the word "entrapment," but otherwise free to develop that theme in jury selection and opening argument and free to adduce evidence of the defense in cross-examinations of the prosecution's witnesses.

The prosecution's witnesses testified substantially as described *ante*. Sergeant Duncan additionally testified that some of defendant's communications were romantic in tone, but that was not unusual in child sex abuse investigations. Duncan explained: "I would say that in the father/daughter-type relationships and dynamics that you see in this one where it's a lot of daddy and—and I'm your protector and different scenarios like that, they're highly romanticized where, as you can see in the messages, there's a lot of lovey-dovey type stuff." He continued: "I think we're talking for two days, and—and now he's in love with this 16-year-old girl."

5

On cross-examination, defense counsel questioned Sergeant Duncan at length as to whether his communications as Kenzie created the appearance of an emotional connection with defendant. Defense counsel emphasized Kenzie's frequent use of affectionate emojis and terms of address such as "handsome," "hottie," and "babe." He intimated that Kenzie engaged in excessive flattery or "love bombing." He suggested Kenzie presented herself as an underage sex worker in order to convey the impression of a "damsel in distress," and thereby arouse defendant's protective instincts. He elicited testimony that Kenzie initiated contact with defendant on more than one occasion. He also elicited testimony that Kenzie repeatedly steered the conversation towards sexual matters, even when defendant seemed to want to discuss other things.[5] Duncan estimated that defendant and Kenzie exchanged more than 650 messages and opined that defendant "romanticized the relationship with a 16[]year old."

Following Sergeant Duncan's testimony, the prosecution briefly called two officers involved in defendant's arrest and then rested. The trial court appears to have been dark for the next couple of days. Nevertheless, defense counsel filed another brief on the issue of entrapment, urging the trial court to revisit its tentative ruling on the motion in limine in light of the evidence adduced to date. Relying on *People v. Barraza* (1979) 23 Cal.3d 675 (*Barraza*), defense counsel argued Sergeant Duncan's testimony provided substantial evidence of entrapment, because Kenzie initiated contact with defendant, made numerous appeals to his friendship and sympathy, and repeatedly steered the conversation towards sexual matters and made graphic overtures in an attempt to induce a meeting. (*Id.* at p. 690 [entrapment may be established "if the actions of the law enforcement agent would generate in a normally law-abiding person a motive for the

---

[5] On one occasion, for example, defendant said he was ready for lunch, and Kenzie responded, "What do u like to eat … other than me?" On another occasion, defendant said he wanted to get to know Kenzie, and she responded, "It makes me hornier that u actually want to know me."

crime other than ordinary criminal intent," such as "an appeal by the police that would induce such a person to commit the act because of friendship or sympathy, instead of a desire for personal gain or other typical criminal purpose"].)

Trial resumed several days later. On the morning of the first day of resumed proceedings, defense counsel filed another brief on entrapment, articulating a slightly different theory. This time, rather than focus on Kenzie's appeals to defendant's friendship and sympathy, defense counsel emphasized Sergeant Duncan's testimony that defendant fell "in love" with Kenzie. Defense counsel argued love could motivate a normally law abiding person to do any number of things, including agreeing to meet an underage girl. Therefore, defense counsel said, Duncan's testimony should be enough to warrant an instruction on entrapment.

The trial court heard argument on defense counsel's newly articulated theory that morning, before the jury was brought in. Following comments from both sides, the trial court reviewed the evidence on the record, commenting at various points that the evidence showed Kenzie presented defendant with opportunities to offend, but did not pressure him to do so. Upon completing that exercise, the trial court remarked, "I just don't think I can get there on substantial evidence." The trial court then indicated the tentative ruling on the prosecution's motion in limine would stand.

Undeterred, defense counsel insisted, "there's more than substantial evidence given all the pressure and the names of endearment and what Sergeant Duncan admitted that my client fell in love with the persona." The trial court appears not to have remembered that aspect of Duncan's testimony. Following further discussion, in which the trial court asked about the context of Duncan's testimony, the court appears to have directed the clerk to locate the testimony on an audiotape of the proceedings. With that effort underway, the trial court considered aloud what more needed to be done before the matter was turned over the jury, and asked defense counsel whether defendant had

7

decided whether to testify. Defense counsel responded that he would be asserting his Fifth Amendment right not to testify.

The audiotape of Sergeant Duncan's direct examination was located and played. Upon hearing the relevant testimony, the trial court admitted, "I understood what was occurring, but I just did not hear him say until today that he formed the opinion he was falling in love with a 16-year-old girl." The trial court then reversed course and concluded that there was sufficient evidence to warrant an entrapment instruction. Shortly thereafter, the jury was brought back into the courtroom and the defense rested.

The jury was instructed on entrapment with CALCRIM No. 3408.[6] Both sides discussed entrapment at length in closing argument.

---

[6] CALCRIM No. 3408, as given here, provides:

"Entrapment is a defense. The defendant has the burden of proving this defense by a preponderance of the evidence.… [¶] … To meet this burden, the defendant must prove that it is more likely than not that he was entrapped. A person is entrapped if a law enforcement officer engaged in conduct that would cause a normally law-abiding person to commit the crime.

"Some examples of entrapment might include conduct like badgering, persuasion by flattery or coaxing, repeated and insistent requests, or an appeal to friendship or sympathy.

"Another example of entrapment would be conduct that would make commission of the crime unusually attractive to a normally law-abiding person. Such conduct might include a guarantee that the act is not illegal or that the offense would go undetected, an offer of extraordinary benefit, or other similar conduct.

"If an officer simply gave the defendant an opportunity to commit the crime or merely tried to gain the defendant's confidence through reasonable and restrained steps, that conduct is not entrapment.

"In evaluating this defense, you should focus primarily on the conduct of the officer. [¶] However, in deciding whether the officer's conduct was likely to cause a normally law-abiding person to commit this crime, also consider other relevant circumstances, including events that happened before the crime, the defendant's responses to the officer's urging, the seriousness of the crime, and how difficult it would have been for law enforcement officers to discover that the crime had been committed.

"When deciding whether the defendant was entrapped, consider what a normally law-abiding person would have done in this situation. Do not consider the defendant's

8

## C.  *Verdict, New Trial Motion, and Sentence*

The jury deliberated for approximately six hours over two court days.  On the second day of deliberations, the jury sent a note asking whether the entrapment defense applied to all charges or only counts 3 (going to a prearranged meeting with a minor for a lewd or lascivious purpose) and 4 (arranging a meeting with a minor for a lewd and lascivious purpose).  The trial court responded that the defense applied to all counts.  The jury reached a verdict shortly thereafter.

The jury found defendant guilty of sending harmful matter to a minor (count 1) and contacting a minor for the purpose of committing a sex offense (count 2).  The jury was unable to reach a verdict on the charges of going to a prearranged meeting with a minor for a lewd or lascivious purpose (count 3) and arranging a meeting with a minor for a lewd and lascivious purpose (count 4), and the prosecution thereafter dismissed both counts.

Following the verdict, defendant moved for a new trial arguing the trial court should have been allowed to openly present and develop his entrapment defense from the beginning of the trial.  According to defendant, "The fact that counsel was precluded from even mentioning entrapment in opening statement, and from developing that theory throughout the evidentiary phase, prevented the jury from evaluating the officers' conduct through the proper legal lens.  Had the jury been properly oriented to the significance of the entrapment defense from the outset, and had it heard an integrated presentation of evidence and argument on that issue, it is reasonably probable that one or more jurors would have concluded the prosecution failed to prove guilt beyond a reasonable doubt."  The trial court denied the motion.

---

particular intentions or character[,] or whether the defendant had a predisposition to commit the crime.
  "[¶] … [¶]
  "If the defendant has proved that it is more likely than not that he committed the crimes because he was entrapped, you must find him not guilty of the charged crimes."

9

The trial court sentenced defendant to two years for sending harmful matter (count 1) and four months for contacting a minor for the purpose of committing a sex offense (count 2), for a total of two years four months in state prison.[7] This appeal timely followed.

## II. DISCUSSION

### A. Section 654

Defendant argues the trial court should have stayed the four-month sentence on count 2 pursuant to section 654. He argues the offenses charged in count 1 (sending harmful matter to a minor) and count 2 (contacting a minor for the purpose of committing a sex offense) were based on the same course of action and involved the same intent. We disagree.

"An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Put another way, section 654 precludes multiple punishment for "a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.] Whether a course of conduct is indivisible depends on the intent and objective of the actor." (*People v. Perez* (1979) 23 Cal.3d 545, 551.)

In the unique context of sex crimes, "multiple sex acts committed on a single occasion can result in multiple statutory violations. Such offenses are generally 'divisible' from one another under section 654, and separate punishment is usually allowed." (*People v. Scott* (1994) 9 Cal.4th 331, 344, fn. 6.) "Even where the defendant has but one objective—sexual gratification—section 654 will not apply unless the crimes were either incidental to or the means by which another crime was accomplished."

---

[7] The trial court sentenced defendant to an additional eight months for an unrelated charge.

10

(*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006 (*Alvarez*).)  Consequently, section 654 has "limited utility to defendants who commit multiple sex crimes against a single victim on a single occasion."  (*Alvarez, supra*, at p. 1006.)

"Whether a defendant harbored a separate intent and objective for each offense is a factual determination for the trial court, and its conclusion will be sustained on appeal if supported by substantial evidence."  (*People v. Hicks* (2017) 17 Cal.App.5th 496, 514-515.)  We review the evidence in the light most favorable to the judgment.  (*Id.* at p. 515.)

Substantial evidence supports the trial court's implied finding that the acts underlying counts 1 and 2 were divisible, and one act was not incidental to the other or the means by which the other act was accomplished.  Count 1 was based on the sexually explicit illustrations defendant sent Kenzie.  Count 2 was based on defendant's other communications with Kenzie.  The drawings and messages were separate and distinct acts that are divisible from one another.  Neither act was incidental to the other or necessary to accomplish the other.  (*Alvarez, supra*, 178 Cal.App.4th at p. 1006.)  Consequently, section 654 does not forbid multiple punishments for counts 1 and 2.

B.      Entrapment Instruction

Defendant argues the trial court was confused by the substantial evidence standard for determining whether to instruct the jury on the defense of entrapment and only came to understand the issue towards the end of the case, after the jury's view of the evidence had begun to solidify.  Had the trial court applied the correct standard, defendant theorizes he would have been able to present the entrapment defense sooner, and more explicitly, and thus might have obtained a more favorable result.  From that premise, defendant argues the trial court should have granted his motion for a new trial.  These arguments fail.

11

### 1. *Applicable Legal Principles and Standard of Review*

Entrapment is an affirmative defense proven by a preponderance of the evidence. (*People v. Fiu* (2008) 165 Cal.App.4th 360, 383.) "In California, the test for entrapment focuses on the police conduct and is objective. Entrapment is established if the law enforcement conduct is likely to induce a *normally law-abiding person* to commit the offense." (*People v. Watson* (2000) 22 Cal.4th 220, 223.) "For the purposes of this test, we presume that such a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime." (*Barraza, supra*, 23 Cal.3d at p. 690.)

Our Supreme Court has established two guiding principles for determining whether police conduct amounts to entrapment: "First, if the actions of the law enforcement agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent, entrapment will be established. An example of such conduct would be an appeal by the police that would induce a person to commit the act because of friendship or sympathy, instead of a desire for personal gain or other typical criminal purpose. Second, affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person will likewise constitute entrapment. Such conduct would include, for example, a guarantee that the act is not illegal or the offense will go undetected, an offer of exorbitant consideration, or any similar enticement." (*Barraza, supra*, 23 Cal.3d at p. 690.)

The *Barraza* court also explained, "while the inquiry must focus primarily on the conduct of the law enforcement agent, that conduct is not to be viewed in a vacuum; it should also be judged by the effect it would have on a normally law-abiding person

12

situated in the circumstances of the case at hand. Among the circumstances that may be relevant for this purpose, for example, are the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission." (*Barraza, supra*, 23 Cal.3d at p. 690.)

"A trial court is 'required to instruct the … jury on the defense of entrapment if, but only if, substantial evidence supported the defense. [Citations.]' [Citation.] We review the record to determine whether defendant presented substantial evidence to support the claimed defense and thus require the trial court to give the jury the entrapment jury instruction." (*People v. Federico* (2011) 191 Cal.App.4th 1418, 1422.) Substantial evidence in this context does not mean "*any* evidence . . . no matter how weak," but " ' "evidence from which a jury composed of reasonable [people] could have concluded" ' that the specific facts supporting the instruction existed." (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677; accord, *People v. Larsen* (2012) 205 Cal.App.4th 810, 823-824.) Because entrapment is an affirmative defense that must be proven by a preponderance of the evidence (*People v. Fiu, supra,* 165 Cal.App.4th at p. 383), substantial evidence to support an entrapment defense means evidence sufficient for a reasonable jury to find the defendant has shown the defense to be more likely than not. (Judicial Council of Cal., Crim. Jury Instns. (2026) Bench Notes to CALCRIM No. 3408.)

After a verdict against a defendant, a trial court may grant the defendant's motion for a new trial "[w]hen the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial," among other grounds. (§ 1181, subd. (5).) A new trial may also be granted on nonstatutory grounds where failure to do so would result in a miscarriage of justice or denial of a fair trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582; *People v. Wittington* (1977) 74 Cal.App.3d 806, 821, fn. 7.)

A trial court's ruling on a motion for new trial is reviewed for abuse of discretion. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 127.) The trial court abuses its discretion when it misconceives its duty, applies an incorrect legal standard, or fails to independently consider the weight of the evidence. (*People v. Robarge* (1953) 41 Cal.2d 628, 633-634.) "A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*People v. Davis* (1995) 10 Cal.4th 463, 524.)

2.       *Analysis*

Defendant argues the trial court was confused about the standard for determining whether an entrapment instruction was warranted. Again, an entrapment instruction was required " 'if, but only if, substantial evidence supported the defense.' " (*People v. Federico, supra,* 191 Cal.App.4th at p. 1422, quoting *People v. Watson, supra,* 22 Cal.4th at pp. 222-223.)

Here, the defense theory at the time for motions in limine was that Sergeant Duncan entrapped defendant by initiating contact, using flattery and sexually enticing language, and appealing to defendant's sympathies. The trial court repeatedly framed the issue as whether that conduct constituted substantial evidence of entrapment. Relying on *People v. Fromuth* (2016) 2 Cal.App.5th 91 (*Fromuth*), the trial court concluded it did not.[8] A brief discussion of *Fromuth* is helpful here.

In *Fromuth*, an undercover officer posted an online advertisement posing as "Maria," a " '[y]oung cutie looking for a hookup.' " (*Fromuth, supra*, 2 Cal.App.5th at p. 96.) He left the age field on the advertisement blank because he intended to pose as a

---

[8] It is undisputed that the trial court relied on *Fromuth*; however, the name of that case is misspelled in the reporter's transcript.

minor and the online platform would have removed the advertisement had he listed an age younger than 18 years. (*Ibid.*) When the defendant responded to the advertisement, the officer revealed that Maria was only 15 years old. (*Id.* at p. 97.) The defendant responded by suggesting that Maria do something other than "hook up," and the officer ended the conversation. (*Id.* at p. 97.) But the defendant continued to monitor the advertisement, and reinitiated contact about an hour later. (*Ibid.*) Later that day, the officer sent an email asking the defendant if he was " 'still interested.' " (*Ibid.*) The defendant said he was, and asked, " 'You think you want to see me?' " (*Ibid.*) The officer responded, " 'If you are down and not into games. We both know what this is about.' " (*Ibid.*) When the defendant responded by seeking a meeting without specifying its purpose, the officer said, " 'Well are you down or do you just want to talk?' " (*Ibid.*) The defendant said he was " 'down,' " and asked how they should meet. (*Ibid.*) A flurry of emails then followed concerning where the defendant and Maria would meet, where they would have sex, and which sex acts Maria would be willing to do. (*Id.* at pp. 97-98.)

The *Fromuth* court held these facts did not support an instruction on entrapment. The court explained: "[The officer's] conduct would not have induced a normally law-abiding man to arrange to have sex with a 15-year-old girl. His conduct did nothing more than present defendant with the opportunity to commit the offense. '[A] person who steals when given the opportunity is an opportunistic thief, not a normally law-abiding person.' [Citation.] Similarly, a person who arranges to have sex with a child when given the opportunity is an opportunistic sexual predator, not a normally law-abiding person." (*Fromuth, supra*, 2 Cal.App.5th at p. 111, italics omitted.) The court rejected the defendant's argument that the officer's conduct, viewed in the context of " 'a lonely male seeking sexual activity with an adult woman on a Saturday night' " was the type of conduct that would induce a normally law-abiding person to commit the offense. (*Ibid.*) The court also rejected the argument that the officer's use of flattery and sexually enticing language would have induced a normally law-abiding man to commit the

15

offense, and the suggestion that the officer enticed the defendant by implying that he could protect "Maria" from other more dangerous men. (*Id.* at pp. 111-112.) The court thus concluded there was "no evidence that [the officer] engaged in any conduct that could have persuaded a normally law-abiding man to agree to a sexual rendezvous with a 15-year-old girl." (*Id.* at p. 112.) "Therefore," the court said, "the trial court did not err in declining to instruct on entrapment." (*Ibid.*)

The evidence known to the trial court at the hearing on the prosecution's motion in limine was similar in kind to that found to have been insufficient in *Fromuth*. (*Fromuth, supra*, 2 Cal.App.5th at pp. 96-98, 99-101.) As in *Fromuth*, the evidence indicated only that Sergeant Duncan presented defendant with opportunities to offend. (*Id.* at p. 111.) There was no evidence that could have led a jury composed of reasonable people to conclude defendant was coerced or pressured into exchanging sexually charged messages with Kenzie or transmitting explicit materials to her. Neither was there any evidence that would have led a reasonable jury to conclude that defendant was coerced or pressured into arranging an encounter with an underage girl. That being so, the trial court was understandably doubtful that defendant would be able to show he was more likely than not entrapped and reasonably exercised its discretion to defer ruling on the motion in limine. (*People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3 ["until the evidence is actually offered, and the court is award of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on admissibility"]; see also *Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 90, fn. 6 [in limine rulings "are 'subject to reconsideration upon full information at trial' "].) Nothing in the record suggests the trial court was confused about the substantial evidence standard or usurped the jury's role in determining the evidence was not substantial enough to deserve consideration by the jury.

Defendant argues the trial court failed to appreciate the significance of Sergeant Duncan's testimony that defendant fell "in love" with Kenzie until the end of the trial. By then, defendant says, it was too late to meaningfully develop the theory that a normally law-abiding man could be induced to commit crimes against an underage girl by feelings of love, however illusory. However, that theory was only clearly articulated for the first time on the last day of trial, after the close of the prosecution's case in chief. And the theory was somewhat obscure. It was based on the *Barraza* court's observation that entrapment may occur when law enforcement induces a person to commit an offense through appeals to "friendship or sympathy," and tethered to Duncan's seemingly offhand remark that defendant was "in love with this 16-year-old girl." (*Barraza, supra*, 23 Cal.3d at p. 690.) As the trial court observed, no published authority recognizes an entrapment defense based on any such application or extension of *Barraza*. Nevertheless, the trial court acknowledged that Duncan's testimony constituted substantial evidence of police conduct that could conceivably generate in a normally law-abiding person a motive other than ordinary criminal intent (i.e., "love"). In the absence of any authority directly on point, the trial court appropriately reversed course and gave the instruction. (See *People v. Petznick, supra*, 114 Cal.App.4th at p. 677 [" ' "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused" ' "].)

We need not decide whether defendant's entrapment theory has legal viability or whether Sergeant Duncan's remark constitutes substantial evidence of police conduct that might induce a normally law-abiding person to offend. For present purposes, we need only reiterate that the trial court granted defendant's request for an entrapment instruction as soon as the theoretical basis for the request was put forward. The trial court was not required to anticipate defendant's novel entrapment theory, which only appears to have been conceived after the close of the prosecution's case in chief, and cannot be faulted for failing to do so sooner.

Defendant also argues the trial court should have granted his new trial motion. However, the order denying the motion carefully considered the defense presentation to the jury, noting defense counsel, though barred from using the word "entrapment" for much of the trial, nevertheless conveyed that theory through jury selection, opening statements and "lengthy and extensive questioning of Sergeant Duncan." The trial court also observed that the ultimate ruling on entrapment came before the defense case-in-chief, giving defendant "ample opportunity to take the stand knowing the jury would be instructed on the defense of entrapment." And, of course, defense counsel argued entrapment directly in closing argument. Defendant does not challenge any of these determinations, all of which are supported by the record, and collectively compel the conclusion that the trial court acted well within its discretion in denying the new trial motion.

## C.     *Sufficiency of the Evidence*

Finally, defendant challenges the sufficiency of the evidence supporting count 1 (sending harmful matter to a minor), arguing the sexually explicit drawings were primarily comical in nature, and would not be offensive to the average person, considering contemporary standards. We are not persuaded.

To assess the sufficiency of the evidence to support the conviction for distributing harmful matter, we review the whole record " ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence —that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) We do not resolve credibility issues or evidentiary conflicts. (*Ibid.*) "Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with

18

a contrary finding does not warrant the judgment's reversal." (*Id.* at p. 358.) Reversal for insufficient evidence is warranted only when, under no hypothesis whatsoever, is there substantial evidence to support the jury's verdict. (*Id.* at p. 357.)

Section 288.2, subdivision (a)(1) makes it a felony or misdemeanor for a person, who knows or believes another person is a minor, to "knowingly distribute[], send[], cause[] to be sent, exhibit[], or offer[] to distribute or exhibit by any means . . . any harmful matter that depicts a minor or minors engaging in sexual conduct, to the other person with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of the minor and with the intent or for the purposes of engaging in sexual intercourse, sodomy, or oral copulation with the other person, or with the intent that either person touch an intimate body part of the other." (§ 288.2, subd. (a)(1).) Subdivision (a)(2) of the same section provides for a slightly reduced felony penalty for situations in which "the matter used by the person is harmful matter but does not include a depiction or depictions of a minor or minors engaged in sexual conduct." (§ 288.2, subd. (a)(2) [imprisonment for 16 months, or two or three years].) The purpose of the statute is to prevent the use of certain material " 'to groom young victims for acts of molestation.' " (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1287.)

For purposes of section 288.2, " '[h]armful matter' " means "matter, taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, and is matter which, taken as a whole, depicts or describes in a patently offensive way sexual conduct and which, taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." (§ 313, subd. (a); see § 288.2, subd. (c) ["For purposes of this section, 'harmful matter' has the same meaning as defined in Section 313"].) " 'Sexual conduct,' " whether actual or simulated, includes sexual intercourse, masturbation, or exhibiting the genital or pubic area for the purpose of sexually stimulating the viewer. (§ 311.4, subd. (d); see § 228.2, subd. (b) [incorporating section 311.4's definition of "sexual conduct"].)

19

Defendant argues the drawings were not "harmful matter" because they were "cartoons," which were intended primarily for comedic purposes. Defendant also observes that the drawings were sent in the context of a conversation about oral sex that Kenzie initiated, and defendant believed Kenzie was a sex worker who had been with older men.

We have reviewed the drawings and conclude that substantial evidence supports the jury's determination that the drawings constitute harmful matter. The first of the drawings depicts a man performing oral sex on a woman, with the caption: "Don't just eat the pussy… Devour it." The second drawing also shows a man performing oral sex on a woman, with hashtags reading "#cunnilingus #Femdom on smutty.com." The third drawing shows cartoon characters Popeye and Olive Oyl engaged in sexual intercourse, with Popeye appearing to penetrate Olive Oyl from behind. None of the drawings convey any serious literary, artistic, political, or scientific message for a minor. The jury could have reasonably concluded the drawings were offensive, despite their attempts at humor (e.g., the use of crude word play). The jury could also reasonably conclude from the context of defendant's communications that he sent the drawings because he wanted to reenact the sexual activities shown in them with Kenzie. That defendant believed Kenzie to be an experienced sex worker does not undermine the reasonableness of the jury's conclusion that the drawings were harmful within the meaning of section 288.2, subdivision (c).

### III.  DISPOSITION

The judgment is affirmed.

/S/
_____
RENNER, Acting P. J.

We concur:

/S/
_____
DUARTE, J.*

/S/
_____
WISEMAN, J.†

---

\* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

† Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.